IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**JOHN C. FERGUSON, IV,**              Case No. 3:15 CV 2714

      Plaintiff,                        Judge James Gwin

      v.                               Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                       REPORT AND RECOMMENDATION

### INTRODUCTION

Plaintiff John C. Ferguson, IV ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. § 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated December 30, 2015). For the reasons stated below, the undersigned recommends the decision of the Commissioner be affirmed.

### PROCEDURAL BACKGROUND

Plaintiff filed for DIB in March 2012, alleging a disability onset date of February 1, 2010. (Tr. 151). His claims were denied initially and upon reconsideration. (Tr. 69-79, 81-95). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 107-08). Plaintiff (represented by counsel) and a vocational expert ("VE") testified at a hearing before the ALJ on June 2, 2014. (Tr. 24-63). On August 28, 2014, the ALJ found Plaintiff not disabled in a written

decision. (Tr. 10-20).[1] The Appeals Council denied Plaintiff's request for review (Tr. 1-4), making the hearing decision the final decision of the Commissioner, *see* 20 C.F.R. §§ 404.955, 404.981. Plaintiff then filed the instant case in federal court on December 30, 2015. (Doc. 1).

**FACTUAL BACKGROUND**

***Personal Background and Testimony***

Plaintiff was 40 years old at the time of the ALJ hearing, and has a GED. (Tr. 31).

He previously worked for the Salvation Army doing a variety of jobs including feeding the homeless, helping out around the center, and bell ringing. (Tr. 32). He did this for five to six hours per day, not eight, and they accommodated his need for breaks. *Id.* Before the Salvation Army job, he performed jobs through a temp service (but it "never last[ed] long because of [his] medical conditions."). (Tr. 33). He related that he could not keep a job for long because he missed work for stomach or back pain, or because of his need use the restroom frequently. (Tr. 34). He described that he has looked for other work: "So I have tried to find work. Like there's some just I could do, maybe something I could probably sit down. And I can't sit down for long periods of times either because it bothers my back or if my stomach starts hurting, I need to lay down on the floor." (Tr. 35). He did not believe he could sustain full-time work on a regular basis unless he "get[s] medical attention that could fix these problems that [he is] having." *Id.*

Plaintiff testified that his gastrointestinal issues stem from the medication, Atripla, which he takes for his HIV status. (Tr. 36). He gets severe knife-like stomach pains and has numerous bowel movements per day, sometimes lacking control. *Id.* These stomach issues have been a

---

1. The ALJ found Plaintiff not disabled through March 31, 2013, which he incorrectly identified as Plaintiff's date last insured. *See* Tr. 20. Plaintiff's correct date last insured was September 30, 2013. (Tr. 169-70). Plaintiff raises this as error and the undersigned will address it *infra*.

problem since he started taking the medication in 2008, but they have gotten more severe with time. (Tr. 36-37).

Plaintiff testified that his back issues stem from being shot in the back in 1994. (Tr. 37-38). Bullet fragments traveled to his spine, his lower back, and inside his shoulder area. (Tr. 38). He gets sharp pains after standing too long and has to lie down. *Id.* He has a caregiver from church who comes over "on a daily basis almost" and helps him dress, cooks, and does laundry. (Tr. 39). He testified that he can dress himself ("I can get up and throw a tee shirt on"), but is unable to button buttons because of swelling in his hands resulting from the gunshot wound. (Tr. 38-39). Regarding physical therapy, Plaintiff explained that he missed appointments because "[s]ometime [he] wasn't feeling up to the part to go to them." (Tr. 49). Plaintiff explained that he stopped because "they wanted to stop that and give me shot treatment." *Id.* He did not want the shot treatment because he is afraid of needles. (Tr. 50). He did not think physical therapy helped his back pain. *Id.*

Plaintiff described a typical day as "sitting in the house watching TV or watching the news or trying to read a book or something." (Tr. 40). He avoids going out because of his gastrointestinal problems. *Id.* He does not drive, and his caregiver does his grocery shopping, dishes, and other household chores. (Tr. 41). Before his stomach condition worsened, he was able to grocery shop. *Id.*

Plaintiff testified that he feels "always stressed out or depressed" because of how his medical conditions limit him. (Tr. 42). He said he "kind of considered" getting mental health treatment a couple of times, but is "tired of people always making promises to help [him] or do something for [him] and [they] don't come through." *Id.* He said he tries to "stay positive" for his kids and "want[s] to get better and go back to work." *Id.* He testified that he has never had

mental health treatment. (Tr. 46). He testified that he does not "feel like [he] ha[s] a mental health problem", but rather thinks he is "just . . . stressed out about what [he is] going through physically" and he does not "think that mentally really [he] has any other problems outside that." (Tr. 47). He testified that his mood swings and depression started with taking Atripla in about 2000. (Tr. 48).

Plaintiff did not believe he could perform a job where he was required to sit because he gets pain and has to move around to make the pain go away. (Tr. 43). When asked if he would have a problem using his hands while doing a seated simple job, Plaintiff responded:

> Yeah, just for long periods of time. If I got to constantly use them and use them – like if I'm just sitting there and I don't have to use my hands for hours or something like that, I'd probably be all right. You know, I'd get up and stretch my legs or stretch out a little bit. But I couldn't sit there and just do that for like hours. I think it would cause problems.

(Tr. 44).

### Relevant Medical Evidence[2]

#### Mental Health

In May 2012, clinical psychiatrist Richard C. Halas, M.A., performed a consultative examination of Plaintiff at the request of the state agency. (Tr. 232-37). Plaintiff's chief complaint was that "he has been shot and has a bullet in his back, he has HIV, and he is unable to do the physical work that he used to do in the past." (Tr. 232). He reported he was divorced and lived with his fifteen-year-old son. *Id.* He also has three other children. *Id.* Plaintiff reported medications of Percocet, Vicodin, Tramadol, and Atripla. (Tr. 233).

---

2. The undersigned here summarizes only the medical evidence related to the errors Plaintiff raises. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (issues not raised in claimant's brief waived). Notably, Plaintiff is HIV positive, but his physician opined that the disease did not cause him any restrictions. (Tr. 230-31, 249-50).

Plaintiff "denie[d] a psychiatric history" and had never consulted with a psychiatrist or psychologist. *Id.* Mr. Halas observed Plaintiff's "most unusual or concerning behavior was a flat, hesitant and tentative presentation" and he "tended, at time, to minimize problems and at other times he tended to be preoccupied by his problems or perhaps exaggerating problems." (Tr. 234). Plaintiff was "tearful at times during [the] appointment" and "had a flat affect and depressed mood." *Id.* Mr. Halas observed Plaintiff to have "relatively high levels of anxiety" and that he "worries about the bullet moving and increasing the pain in his back, stomach and right shoulder." (Tr. 234-35). Plaintiff's short term memory was below average, but he was able to do simple calculations and his "estimated intellectual levels were in the low average range." (Tr. 235).

Mr. Halas assessed dysthymia and generalized anxiety disorder, as well as borderline personality disorder with antisocial features, paranoid traits. (Tr. 236). In his functional capacity assessment, Mr. Halas opined Plaintiff: 1) "appears to have problems" in the ability to understand, remember, and carry out instructions; 2) "would appear to have" little or no difficulty in maintaining attention and concentration, and maintaining persistence and pace to perform simple tasks and to perform multi-step tasks; 3) "would appear to have significant difficulties" in the ability to respond appropriately to supervision and coworkers in a work setting; and 4) "appears to have severe problems" in the ability to respond appropriately to work pressures in a work setting. (Tr. 236-37).

In July 2012, Bonnie Katz, Ph.D., reviewed Plaintiff's records for the state agency. (Tr. 76-77). Regarding Plaintiff's concentration and persistence, Dr. Katz concluded Plaintiff was not significantly limited in his ability to: 1) carry out short and simple instructions; 2) perform activities within a schedule, and be punctual; 3) sustain an ordinary routine without special

supervision. (Tr. 76). She concluded Plaintiff was moderately limited in his ability to: 1) carry out detailed instructions; 2) maintain attention and concentration for extended periods; 3) work in coordination or in proximity to others without being distracted by them; 4) ability to make simple work-related decisions; and 5) ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. *Id.* She explained Plaintiff could "perform simple and somewhat complex tasks in a solitary setting without fast paced production standards [and] he can make simple decisions." *Id.*

Regarding Plaintiff's social interaction limitations, Dr. Katz concluded Plaintiff was not significantly limited in his ability to: 1) ask simple questions or request assistance; and 2) ability to maintain socially appropriate behavior. (Tr. 76-77). She concluded he was moderately limited in his ability to: 1) accept instructions and respond appropriately to criticisms from supervisors; and 2) ability to get along with coworkers or peers. (Tr. 77). She concluded Plaintiff was markedly limited in his ability to interact appropriately with the general public. *Id.* Dr. Katz explained Plaintiff was "capable of limited, brief and superficial interaction with others[, but n]ot able to deal with the public in a reliable manner, nor to be around crowds." *Id.*

Regarding Plaintiff's adaptation limitations, Dr. Katz concluded Plaintiff was "able to adapt to infrequent changes in routine in a predictable setting with clear performance expectations." *Id.* He was moderately limited in his ability to: 1) respond appropriately to changes in the work setting; and 2) ability to travel in unfamiliar places. *Id.* But he was not significantly limited in his ability to: 1) be aware of normal hazards and take appropriate precautions; and 2) set realistic goals or make plans independently of others. *Id.*

6

Dr. Katz gave Mr. Halas's opinion "great weight" (Tr. 75), and answered "no" to a question regarding whether there were medical source opinions "which are more restrictive than your findings" (Tr. 77).

In December 2012, Paul Tangeman, Ph.D., reviewed Plaintiff's records on reconsideration and reached the same conclusions as Dr. Katz (Tr. 91-93). Like Dr. Katz, Dr. Tangeman gave Mr. Halas's opinion "great weight" (Tr. 90), and also answered "no" to the question regarding whether there were medical source opinions "which are more restrictive than your findings" (Tr. 93).

*Physical Health*

*Treatment Evidence*

In November 2012, Plaintiff underwent a myelogram and lumbar spine CT scan. *See* Tr. 263-81. The lumbar spine CT noted the reason for the exam was "L[eft] herniated disc" and the clinical information stated: "Back pain. History of a remote gunshot injury." (Tr. 278). The interpreting physician noted "[n]o significant CT abnormality." *Id.* The lumbar myelogram was also normal. (Tr. 280).

Plaintiff saw Daniel Modarelli, D.O., in December 2012 for back pain. (Tr. 282-83). Dr. Modarelli noted tenderness to palpation in Plaintiff's back, and a negative straight leg test bilaterally. (Tr. 282). Dr. Modarelli referred Plaintiff to physical therapy. *Id.*; *see also* Tr. 425 (physical therapy referral). Dr. Modarelli also noted abnormal laboratory lipase and amylase results and instructed Plaintiff to "return if abdominal pain returns." (Tr. 283).

In December 2012, Plaintiff went to the Lake Health Emergency Department complaining of lower left quadrant abdominal pain and left flank pain. (Tr. 424-49). An abdominal and pelvic CT scan showed "a 3 x 4 mm calcification within dependent aspect of the

urinary bladder medial to the left UV junction suggestive of a recently passed calculus. There is associated mild left hydronephrosis and hydroureter." (Tr. 448).

Plaintiff had his first physical therapy appointment later in December. (Tr. 410-14). He reported chronic lower back pain due to a 1994 gunshot wound to the left scapular region. (Tr. 412). Plaintiff stated he had "a sharp pain [in his] lower back that never goes away when standing too long, sitting, bending and walking." (Tr. 410). He reported his symptoms intensified recently when working as a construction laborer. *Id.* His pain level was a 6/10 (Tr. 414) and 10/10 (Tr. 412). Plaintiff was treated with thermal therapy and mechanical traction. (Tr. 414). He reported his symptoms increased with standing and walking, and decreased with rest. (Tr. 412). The physical therapist recommended he come twice per week for four weeks. (Tr. 413). He reported his current medications at this time as "per", Motrin, and ibuprofen. (Tr. 411).

Twice in December 2012 and twice in early January 2013, Lake Health Physical Therapy notes indicate Plaintiff missed his appointments. (Tr. 420-22). In mid-January 2013, Plaintiff had a physical therapy appointment. (Tr. 418). He reported lower back pain with a pain level of 8/10, and wondered if his stomach problems were causing his back pain. (Tr. 418). He was treated with thermal therapy and mechanical traction. *Id.* The physical therapist noted he was able to touch the floor with his fingertips, had pain in paraspinals, but no problems with extension. *Id.* She recommended he continue with the current plan of care. *Id.* One week later, Plaintiff returned to physical therapy and reported his pain level had decreased (to 5/10) since the last visit. (Tr. 417). He reported wearing a back brace regularly, which kept his pain at a 5/10 level instead of 7-8/10. *Id.* He again was treated with thermal therapy and mechanical traction, and was given therapeutic exercises. *Id.* The therapist noted the "[b]race seems to give some relief of [symptoms]" and that Plaintiff had "poor tolerance to exercises." *Id.* She again suggested he

8

continue with the current plan of care. *Id.* Two days later, at his fourth physical therapy visit, Plaintiff reported his pain level had not changed, or slightly increased and that he was "[r]eally frustrated" and "not sure why pain continues." (Tr. 416). He reported feeling good during traction, but gets sharp pain regularly. *Id.* He did not have time for therapeutic exercises as he had an appointment with Dr. Modarelli. *Id.*

In January 2013, Plaintiff again saw Dr. Modarelli, who noted that Job and Family Services needed "a current visit note to continue benefits per p[atien]t." (Tr. 298). He stated Plaintiff reported a back pain of 7 and was in no acute distress. *Id.* In his review of symptoms he noted "Negative for, joint swelling, joint pain, weakness, back pain", but also assessed back pain as Plaintiff's primary problem. (Tr. 298-99). His treatment plan stated "letter written, cont fyu [*sic*] w pt and specilaists [*sic*]", and he instructed Plaintiff to follow up as needed. (Tr. 298)

Later in January 2013, Plaintiff saw gastroenterologist Gregory S. Powell, M.D. (Tr. 284-87). He complained of abdominal pain, diarrhea, and frequent bowel movements. (Tr. 284). He described several years of intermittent abdominal pain, and specifically diarrhea for the prior two years. *Id.* He also reported a recent emergency room trip for kidney stones. *Id.* Dr. Powell noted normal bowel sounds, no tenderness or guarding, and no masses on examination. *Id.* At the appointment, Plaintiff reported his current medications as Atripla once daily; and Motrin, ibuprofen, and aspirin as needed. (Tr. 286). Dr. Powell assessed abdominal pain, diarrhea, and nephrolithiasis, and recommended Plaintiff undergo an endoscopy. (Tr. 285).

In February 2013, Plaintiff went to the Lake Health Emergency Department complaining of burning and cramping abdominal pain on and off for about a week. (Tr. 374-405). The clinical impression was acute gastritis. (Tr. 376). A CT of the abdomen and pelvis showed a "[n]ormal appendix"; "[m]inimal diverticula, no acute bowel abnormality"; and "[n]o definite acute

9

abnormality in the abdomen or pelvis." (Tr. 381). The final CT report noted a "[n]ormal CT of the abdomen and pelvis." (Tr. 404).

In May 2013, a Lake Health Physical Therapy discharge report stated "poor attendance. Too infrequent to have therapeutic effect." (Tr. 405). His therapy diagnosis was mechanical lower back pain. *Id.* Plaintiff had four visits, and six no shows. *Id.* Boxes were checked indicating "[n]o improvement" and "[p]atient failed to return for treatment." *Id.* The reason for discharge was a box checked indicating: "[p]atient stopped coming, self-discharge." *Id.*

In July 2013, Plaintiff underwent an upper GI endoscopy with Dr. Powell. (Tr. 288-89). Dr. Powell's impression was a "[n]ormal esophagus"; "[g]astritis"; a "[n]ormal examined duodendum"; and "[r]etained gastric fluid." (Tr. 288). He recommended Plaintiff take Protonix daily for two months. *Id.* Pathology results from the endoscopy showed "mild duodenal intraepithelial lymphocytosis", which "may be seen in a wide variety of conditions, particularly treated or clinically latent celiac sprue, non-steroidal anti-inflammatory drug use, and infection." (Tr. 290). Pathology also showed "mild chronic inactive gastritis." *Id.* A test for celiac disease administered in October 2013 was negative (Tr. 291), as was a glucose hydrogen breath test administered in September 2013 (Tr. 293).

On October 14, 2013, Plaintiff reported to the Lake Health Emergency Department complaining of abdominal pain for three days. (Tr. 347-73). An abdominal and pelvic CT was negative. (Tr. 371-72).

Again on October 21, 2013, Plaintiff reported to the Lake Health Emergency Department complaining of abdominal pain and a headache. (Tr. 324, 335). He stated he has had abdominal pain for years, but the headache started that day. (Tr. 330). He reported "intermittent" abdominal pain for eight to nine months and diarrhea and was "quite anxious about his chronic abdominal

10

pain issues." (Tr. 335). His abdomen was "[s]oft, nontender to palpation" and "[b]owel sounds were auscultated." (Tr. 336). The headache improved after taking some Advil. *Id.* He was instructed to follow up with his gastroenterologist and primary care physician. (Tr. 325, 328-29, 336). He told the emergency room physician that he was going to contact his gastroenterologist the following day. (Tr. 336).

In December 2013, records from University Hospital of Cleveland indicate chronic mild gastritis as "confirmed" and that Plaintiff's current medications were: Atripla, Nicoderm, and Omeprazole EC. (Tr. 301).

Finally, an undated medication list includes Aspirin, Atripla, Efavirenz, Emtricitabine, Ibuprofen, Patoprazole, Tenofovir, and Tylenol with Codeine. (Tr. 450-51). It lists the reasons for the medication, dosage, and side effects, and states each medication was "[f]irst [p]rescribed" on February 1, 2010. *Id.*

### Opinion Evidence

In July 2012, Linda Hall, M.D., reviewed Plaintiff's records for the state agency. (Tr. 75). She concluded Plaintiff had the RFC to: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; and stand and/or walk, or sit, for a total of six hours in an eight-hour workday. *Id.* Thus, she concluded, Plaintiff was capable of "medium" work. (Tr. 78). On reconsideration, Elizabeth Das, M.D., reached the same conclusions. (Tr. 90-95).

### VE Testimony and ALJ Decision

### VE Testimony

The VE first clarified some of Plaintiff's past work experience. (Tr. 52-55). She was then asked to consider a hypothetical individual who is:

> 41 years old, has the equivalent of a high school education, no currently relevant vocational training. This hypothetical worker has no exertional limitations. He is

11

however limited to simple, routine, low-stress work. And to say more about what I mean about simple, routine, low-stress work, he's precluded from work in fast-paced production environments. One example of fast-paced production environment would be a fast-moving assembly line. Another example would be work paid at a piece rate. And again further defining simple, routine, low-stress, he's precluded is this hypothetical worker from work done in public and from work that involves interaction with the public. And I mean to be strict about both of those limitations. Work done in public, for example, would include even such incidental public contact as a person who let's say cleans hotel rooms and might run into somebody or who bus tables in a restaurant. That would be precluded. Interaction with the public even - - well, certainly face-to-face interaction would be precluded, but also telephonic interaction would be precluded.

The hypothetical worker is further limited to no more than superficial interaction with supervisors and coworkers and is precluded from tasks that require arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety of others.

(Tr. 55-56). The VE testified such an individual could not do Plaintiff's past relevant work, but there are jobs in the national and regional economy that such an individual could do such as warehouse worker, packer, and industrial cleaner. (Tr. 56-57).

In response to questioning from Plaintiff's attorney, the VE testified that a person could miss work once every five weeks and be off task for up to fifteen percent of the workday and still maintain competitive employment. (Tr. 58).[3]

*ALJ Decision*

The ALJ concluded Plaintiff's date last insured was March 31, 2013,[4] and Plaintiff did not engage in substantial gainful activity during the period from his alleged onset date of February 1, 2010 through his date last insured. (Tr. 12). He concluded Plaintiff had severe impairments of dysthymic disorder, a generalized anxiety disorder, and a borderline personality disorder, as well as non-severe impairments of HIV infection, gastritis and back pain, but that

---

3. The VE was also questioned regarding limitations in the use of the individual's hands. (Tr. 58-60). Because Plaintiff does not raise any challenge to the ALJ's decision in this regard, the undersigned does not summarize it.

12

these impairments or combination of impairments do not meet or equal the severity of the listings. (Tr. 12-14). The ALJ then concluded Plaintiff retained an RFC to include:

> no exertional limitations. He is limited to simple, routine, low-stress environments, such as on an assembly line or piece rate work. It also means that he is precluded from work done in public and from work that involves interaction with the public. It also means that he is precluded from more than superficial interaction with supervisors and co-workers. Finally, it means that he is precluded from tasks that involve arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety of others.

(Tr. 16). The ALJ then concluded there were jobs available in significant numbers in the national economy that Plaintiff could have performed (Tr. 18), and he was therefore not disabled "at any time from February 1, 2010, the alleged onset date, through March 31, 2013, the date last insured" (Tr. 19).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court

---

4. As noted above, this date was incorrect, and that error will be addressed *infra*.

cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

4.  Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and

meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Plaintiff raises several interrelated objections to the ALJ's decision: 1) the ALJ failed to correctly identify Plaintiff's back pain as a severe impairment at step two; 2) the ALJ did not properly consider Plaintiff's back pain in formulating the RFC; 3) the ALJ misidentified the date last insured and this was not harmless error; and 4) the ALJ erred in his consideration of the opinion of the consultative examiner, Mr. Halas. The Commissioner responds that the ALJ's decision is supported by substantial evidence and the misidentification of the date last insured was harmless error.

### *Step Two Determination / RFC (Physical)*

Plaintiff first contends the ALJ erred in not finding his back pain a severe impairment at step two. The Commissioner responds that this error is harmless as long as another impairment was found to be severe—and it was here. Plaintiff also contends the ALJ failed to consider his back pain in formulating the RFC. The Commissioner responds that the RFC is supported by substantial evidence.

A severe impairment is one which significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.1520(c). An impairment is only considered nonsevere if it is a "slight abnormality that minimally affects work ability regardless of age, education, and experience." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).

The Sixth Circuit has held that where the ALJ finds the presence of a severe impairment at step two and proceeds to continue through the remaining steps of the analysis, the alleged failure to identify as severe some other impairment constitutes harmless error so long as the ALJ

15

considered the entire medical record in rendering his decision. *See Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); *Kirkland v. Comm'r of Soc. Sec.*, 528 F. App'x 425, 427 (6th Cir. 2013) ("[S]o long as the ALJ considers all the individual's impairments, the failure to find additional severe impairments . . . does not constitute reversible error[.]"); *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (holding that as long as ALJ considers all impairments, failure to deem a single impairment non-severe is "legally irrelevant"). Therefore, the failure to identify Plaintiff's back pain as a severe impairment is not error in and of itself.

Plaintiff argues that it is "still reversible error" if "it is not clear that the ALJ considered the 'non-severe' impairment at the other steps of the sequential evaluation process." (Doc. 14, at 7). Although the ALJ did not find Plaintiff had any restrictions from his back pain, this does not mean he did not consider it, and in fact a review of the decision indicates otherwise. At step two, the ALJ explained:

> The claimant has complained of lower back pain . . . but his treatment for these complaints has been quite limited. A November 2012 myleogram of the claimant's lumbar spine was normal and a CT showed no significant abnormalities [citing Tr. 278-80]. In December 2012, the claimant was negative for straight leg raising [citing Tr. 28]. His doctor prescribed physical therapy for his lower back pain, but the claimant didn't go [citing Tr. 419-22]. The claimant takes over-the-counter medication for his back pain [citing Tr. 450-51]. The evidence does not support a finding that the claimant has severe back pain. Moreover, there is no evidence that would support a conclusion that the residual effects of his 1994 gunshot wound are severe.

(Tr. 13). Later, in the RFC analysis, the ALJ explained:

> The claimant testified that he needs assistance to get dressed and button his sh[i]rt, although he reported no such limitation in his function report [citing Tr. 184-91]. The claimant also reported that he has difficulty doing most activities of daily living, although these reports are not supported by the claimant's medical treatment history. For example, the claimant alleged that he is unable to perform most activities of daily living due to pain and depression [citing Tr. 184-91]. The claimant has had very little treatment for his reported back and abdominal pain, even though he has health insurance through Medicaid. It is implausible that he would not pursue treatment if his symptoms were as severe as he has alleged. The

> claimant also failed to attend his physical therapy sessions, which again indicates
> that his physical condition is likely not as limiting as he has alleged.

(Tr. 17). The ALJ also rejected the state agency consultant's opinions that Plaintiff was limited to medium work for the same reasons. *Id.*

Plaintiff argues evidence of record supports that his back pain should have been—and was not—considered or accommodated in the RFC, citing: 1) Plaintiff's testimony; 2) Plaintiff's frequent complaints of back pain; 3) Plaintiff's physical therapy records; and 4) Dr. Das's opinion that Plaintiff suffered from a severe back impairment and was limited to medium work. (Doc. 14, at 8). The undersigned finds the ALJ's RFC determination (containing no limitations) supported by substantial evidence and no error.

First, a review of the ALJ's decision as a whole indicates he considered—and rejected—Plaintiff's allegations that he had exertional limitations stemming from his back pain. In the RFC analysis, the ALJ cited Plaintiff's minimal treatment for back pain despite having health insurance, and failure to attend physical therapy sessions. *See* Tr. 17. In his analysis of state agency physician Dr. Das's opinion, he refers back to his step two analysis of the evidence regarding Plaintiff's back problems. *Id.* ("For the reasons stated above, the undersigned has concluded that the evidence does not support a conclusion that the claimant has a severe physical impairment[.]"). These are proper considerations. *See* SSR 96-7p, 1996 WL 374186 ("[T]he individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure."); *Strong v. Soc. Sec. Admin*, 88 F. App'x 841, 946 (6th Cir. 2004) ("[W]hen a claimant alleges pain so severe as to be disabling, there is a reasonable expectation that a claimant will seek examination or treatment. A failure to do so may cast doubt on a claimant's assertions of disabling pain.")

17

(internal citations omitted). "Further, a failure to seek treatment for a period of time may be a factor to be considered against the plaintiff." *Miller v. Astrue*, 2011 WL 6749059, *1 (E.D. Ky.) (citing *Hale v. Sec'y of Health & Human Servs.*, 816 F.2d 1078, 1082 (6th Cir. 1987)).[5]

Second, the ALJ specifically referred back to his step two analysis regarding Plaintiff's back pain in rejecting Dr. Das's opinion.[6] (Tr. 16). In that analysis (at step two), he pointed to Plaintiff's minimal treatment, lack of objective findings to support back problems, and only taking over-the-counter medication for the pain. (Tr. 13). This is supported by the evidence of record. A November 2012 myelogram and lumbar spine CT showed no significant abnormalities. (Tr. 278-80). A December 2012 visit note from Dr. Modarelli showed a negative straight leg test bilaterally. (Tr. 282). In January 2013, a note from Dr. Powell indicates Plaintiff has "occasional lower back pain" for which he takes ibuprofen "about two times per week." (Tr. 296); *see also* Tr. 13 (ALJ noted Plaintiff took over-the-counter medication for his back pain) (citing Tr. 450-51).[7] *See Blacha v. Sec'y of Health & Human Servs.,* 927 F.2d 228, 231 (6th Cir.1990) ("Further,

---

5. A claimant's failure to seek treatment may be explained by the lack of financial resources to pay for that treatment, however, here, the ALJ specifically noted Plaintiff had Medicaid coverage. (Tr. 17).

6. For this reason, the undersigned finds the cases cited by Plaintiff—*Patterson v. Colvin*, 2015 WL 5560121, *4-5 (N.D. Ohio) and *Kochenour v. Comm'r of Soc. Sec.*, 2015 WL 9258609, *6 (N.D. Ohio)—distinguishable. In those cases, the ALJ failed to discuss mental impairments he found non-severe during the RFC analysis, discussing only physical impairments. Here, although the ALJ did not credit Plaintiff's claims of back pain, he discussed them and described why he did not.

7. Although Plaintiff indicated aspirin ("200 mg two tablets as needed for pain") and ibuprofen ("200 mg two tablets as needed for stomach pain") were "prescribed" for his pain, *see* Tr. 450-51, there is no evidence in the record from a physician to support this assertion, and the dosages listed are over-the-counter dosages. *See* Physician's Desk Reference, *Ibuprofen*, http://www.pdr.net/drug-summary/Ibuprofen-Tablets-ibuprofen-2618 (last visited December 22, 2016) (noting oral dosage of ibuprofen for self-treatment treatment of pain is 200 mg every four to six hours; "may increase to 400 mg PO every 4 to 6 hours as needed"); Medscape Reference, *Aspirin* (*Rx, OTC*), http://reference.medscape.com/drug/zorprin-bayer-buffered-aspirin-343279

[plaintiff's] use of only mild medications (aspirin) undercuts complaints of disabling pain, as does his failure to seek treatment[.]").

Third, with regard to physical therapy, as noted above, failure to seek or follow treatment is a valid reason for discounting a Plaintiff's credibility. Although Plaintiff's expressed frustration that physical therapy did not provide quick relief, the physical therapy discharge report noted "poor attendance. Too infrequent to have therapeutic effect." (Tr. 405); *see also* Tr. 420-22 (four missed physical therapy appointments in December 2012 and January 2013 after attending only a single appointment). In fact, despite Dr. Modarelli's recommendation in January 2013 that Plaintiff continue to follow up with physical therapy (Tr. 298), the record reflects that Plaintiff never returned. This failure to follow prescribed treatment is also a valid reason for the ALJ to discount Plaintiff's claims that his back pain was disabling. *Sias v. Sec'y of Health & Human Servs.*, 861 F.2d 475, 480 (6th Cir. 1988); SSR 96-7p, 1996 WL 374186.

With regard to Dr. Das's opinion, the undersigned agrees with the Commissioner that the ALJ's rejection of that opinion is, at most, harmless error. Dr. Das's opinion concluded Plaintiff could perform a full range of medium work. *See* Tr. 90-91 (exertional limitations); 94 (concluding Plaintiff could do medium work); SSR 83-10, 1983 WL 31251 (defining medium work). Although the ALJ found no physical limitations, two of the three positions identified by the VE were at the medium exertional level. (Tr. 19, 57) (identifying industrial cleaner and packer as possible jobs); *see also* Dictionary of Occupational Titles § 323.687-010, 1991 WL 672782 (cleaner as "medium" work); Dictionary of Occupational Titles § 920.587-018, 1991 WL 687916 (packer as "medium" work). In combination, the VE and ALJ identified these two jobs

---

(last visited December 22, 2016) (noting over the counter dose for aspirin for pain is 325 to 650 mg). The medication list also includes Tylenol with codeine, but states it was prescribed for stomach pain, and there is nothing in the record to indicate it was used for back pain. *See* Tr. 451.

as comprising approximately 7,000 jobs in Ohio. (Tr. 19, 57). This is a significant number of jobs. *Cf. Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1998) (finding between 1,350 and 1,800 jobs in the region to be a "significant number"). Thus, any failure to credit Dr. Das's opinion limiting Plaintiff to medium work is harmless error at most. Even if the ALJ adopted that opinion, the outcome would be the same. *Cf. Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547-48 (6th Cir. 2004) ("There was no reason to remand the case because, wittingly or not, the ALJ attributed the claimant limitations consistent with those identified by the treating physician.").

As the ALJ noted, there was no opinion from a treating physician regarding Plaintiff's functional ability. (Tr. 16). The ALJ adequately explained his reasons for concluding Plaintiff's back pain was not functionally limiting. And, even if the ALJ had fully credited the only opinion evidence in the record—from the state agency—the outcome would not change. Moreover, the Court notes that it reviews the ALJ's RFC assessment not for complete or exact correlation between the evidence and the ALJ's findings, but for legal error or lack of substantial supporting evidence. Finding neither in this case, the undersigned recommends the ALJ's physical RFC determination be affirmed.

### *Date Last Insured*

Plaintiff's next argument is that the ALJ misidentified his date last insured, and he was prejudiced by this error. The Commissioner does not dispute that the date used was incorrect, but asserts the error is harmless.

Plaintiff's eligibility for DIB is determined by the date that he was insured for such benefits. A plaintiff's insured status ceases in the last quarter in which he had twenty quarters of contribution into the Social Security system within a forty-quarter period. *See* 42 U.S.C. §§ 416(i); 423(c)(1)(b)(i); 20 C.F.R. § 404.130(b). To obtain DIB benefits, Plaintiff must establish

that the "onset of disability" was prior to September 30, 2013, the date his insured status expired, and that his disability lasted for a continuous period of twelve months. 42 U.S.C. § 423(a), (c), (d)(1)(A); *see also Smith v. Comm'r of Soc. Sec.*, 202 F.3d 270 (6th Cir. 1999). Post-insured status evidence of new developments in a claimant's condition is generally not relevant. *Bagby v. Harris*, 650 F.2d 836 (6th Cir. 1981). In addition, evidence of a claimant's medical condition after the last insured date is only considered to the extent it illuminates that condition before the expiration of the claimant's insured status. *See Higgs*, 880 F.2d at 863; s *King v. Sec'y of HHS*, 896 F.2d 204, 205-06 (6th Cir. 1990) (post-expiration evidence may be considered, but it must relate back to plaintiff's condition prior to the expiration of date last insured).

Courts have held that the use of an incorrect date last insured may be harmless when the ALJ's denial of disability benefits does not turn on a plaintiff's date last insured, or the plaintiff cannot show prejudice from the use of the incorrect date. *See, e.g., Mais v. Colvin*, 2016 WL 5371578, *8 (E.D. Mo.) (finding harmless error where ALJ "correctly summarized the substance of all the medical opinions and evidence" and plaintiff did not show prejudice); *Odette v. Comm'r of Soc. Sec.*, 2010 WL 2104300, *10 (E.D. Mich.) (finding harmless error where denial of benefits did not turn on the date last insured); *Gore v. Astrue*, 2010 WL 4053639, *5 (N.D. Tex.) (finding harmless error where the ALJ considered medical evidence beyond the incorrect date last insured).

The ALJ based his decision on a date last insured of March 31, 2013. *See* Tr. 12, 20. This date was used by the state agency physicians. *See* Tr. 69, 81. However, Plaintiff earned additional credit for this 2012 work activity, and the date last insured was later extended to September 30, 2013. (Tr. 169-70). The ALJ's date, was therefore clearly incorrect and in error.

The question is whether the error was prejudicial. The undersigned agrees with the Commissioner that it was not.

Plaintiff argues that "because of this mistake 6 months of medical records were essentially ignored" and that "after step two of the sequential evaluation process there is not a single reference [to] any evidence that postdates March 31, 2013." (Doc. 14, at 11). The second statement is true, however, the first is misleading. The only evidence of record Plaintiff points to between April 2013 and September 2013 (the correct date last insured) is a July 2013 upper endoscopy. (Tr. 288-89).[8] Preliminarily, the undersigned notes that there are no mental health or back-pain related records from this time period, and Plaintiff's arguments are directed only toward his gastrointestinal problems.

In his step two analysis, the ALJ considered and addressed Plaintiff's gastrointestinal problems, and specifically mentioned the July 2013 endoscopy:

> The claimant also complained of abdominal pain and diarrhea during the relevant period [citing Tr. 296-99]. The claimant saw a gastroenterologist who conjectured that one of the claimant's HIV medications might have been causing him some abdominal pain. An upper endoscopy showed mild chronic gastritis [citing Tr. 284-95; 301]. The claimant still takes his HIV medication and there is no objective evidence to suggest that the claimant's gastritis causes him pain that would prevent him from working or that it would cause any functional limitations in the workplace. The evidence indicates that he has had minimal care for this problem. The claimant's mild gastritis is not a severe impairment.

(Tr. 13). Although the ALJ did not discuss Plaintiff's gastritis beyond step two of his analysis, the language clearly indicates he concluded Plaintiff's gastritis would not affect his ability to work: "[t]here is no objective evidence to suggest that the claimant's gastritis causes him pain that would prevent him from working or that it would cause any functional limitations in the

---

8. The undersigned notes that the Commissioner incorrectly identifies this as "prior to the correct date last insured", though later on the same page refers to it as "from the time period." (Doc. 17, at 17). The endoscopy was performed between the date the ALJ incorrectly identified as the date last insured—March 31, 2013—and the correct date—September 30, 2013. *See* Tr. 288-89.

workplace." *Id.* The undersigned agrees with the Commissioner's citation to *Curvin v. Colvin*, 778 F.3d 645, 650 (7th Cir. 2015), for the proposition that a Court should not "discount [a discussion] simply because it appears elsewhere in the decision" because "[t]o require the ALJ to repeat such a discussion throughout his decision would be redundant." Here, although the ALJ's analysis of the July 2013 record appeared in his step two analysis, the reasoning articulated clearly applied to his RFC determination as well.

The ALJ, therefore, considered the only medical evidence of record from the relevant time period, indicating he found it relevant to his disability determination. And his consideration thereof was reasonable. Although Plaintiff had complained of stomach problems, the ALJ noted his gastritis was described as "mild" and that there was no evidence in the record to suggest it would limit his ability to work. And despite Plaintiff's report to Dr. Powell in January 2013 that his diarrhea started two years prior (Tr. 296), there are very few records of complaints or treatment during that time period. *See* Tr. 17 (ALJ noting Plaintiff's relatively limited treatment for his abdominal pain issues).

Additionally, the undersigned agrees with the Commissioner that the later records (which are not discussed by the ALJ) do not change this analysis. After September 30, 2013 (the correct date last insured), Plaintiff had two visits to the emergency room—on October 14 and October 21—complaining of abdominal pain. (Tr. 347-73, 324-36). During the first visit Plaintiff reported abdominal pain for the previous three days, and an abdominal and pelvic CT was negative. (Tr. 371-72). During the second visit, Plaintiff reported "intermittent" abdominal pain for the prior eight to nine months (Tr. 335), non-bloody diarrhea and mid-epigastric pain (Tr. 357). He was instructed to follow up with his gastroenterologist. (Tr. 325, 328-29, 336). The only other evidence of record is a December 2013 record from University Hospital Cleveland

that indicates Plaintiff's "chronic mild gastritis" is "confirmed" (based on the July 2013 endoscopy). (Tr. 301). There are no additional records from Plaintiff's gastroenterologist. These records do not show any substantial change in Plaintiff's condition during the relevant time period not recognized by the ALJ, or undermine his conclusion that "there is no objective evidence to support that [Plaintiff's] gastritis causes him pain that would prevent him from working or that it would cause any functional limitation in the workplace." (Tr. 13).

Although there was certainly other evidence in the record to support that Plaintiff was limited by his gastrointestinal issues, namely Plaintiff's testimony, the ALJ's decision deciding to the contrary is also supported by substantial evidence. The ALJ's consideration of the incorrect date was harmless for the reasons discussed above. Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. Substantial evidence supports the ALJ's consideration of Plaintiff's gastrointestinal issues. Because Plaintiff cannot show prejudice from the ALJ's use of the incorrect date, the undersigned recommends the Court find it harmless error and affirm the Commissioner's decision.

### Consideration of Consultative Examiner Mr. Halas / RFC (Mental)

Plaintiff's final argument is that the ALJ's mental RFC is not supported by substantial evidence because the ALJ did not properly analyze and erroneously discredited Mr. Halas's opinion. The Commissioner responds that the ALJ adequately considered Mr. Halas's opinion and the mental RFC is supported by substantial evidence.

State agency physicians are experts in the evaluation of Social Security deniability claims. 20 C.F.R. § 404.1527(e)(2)(i). When considering such opinions, an ALJ "will evaluate

the findings using relevant factors . . . such as the consultant's medical specialty and expertise . . ., the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions." 20 C.F.R. § 404.1527(e)(2)(ii).

The Sixth Circuit has cautioned that "it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." *Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989). Additionally, it has recognized that: "ALJ's must be careful not to assume that a patient's failure to receive mental-health treatment evidences a tranquil mental state. For some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself." *White v. Comm'r of Soc. Sec.,* 572 F.3d 272, 283 (6th Cir. 2009) (citing *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009). In *Pates-Fires*, the Eighth Circuit case that *White* is based upon (which involved medication noncompliance), the court noted that "federal courts have recognized a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the result of [the] mental impairment [itself] and, therefore neither willful, nor without a justifiable excuse." *Pate-Fires*, 564 F.3d at 945 (internal citation omitted) (alterations in original). The Eighth Circuit later clarified its position and held that noncompliance by mentally ill claimants will be justified when there is some evidence linking the mental illness to the noncompliance. *See Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) ("[U]nlike in *Pate-Fires*, there is little or no evidence expressly linking [plaintiff's] mental limitations to such repeated noncompliance."). This is not inconsistent with the court's conclusion in *White* that "there [was] no evidence in the record explaining [the Plaintiff's] failure to seek treatment during this half-year gap" [and] "[a] 'reasonable mind' might therefore find

that the lack of treatment . . . indicated an alleviation of [the Plaintiff's] symptoms." 572 F.3d at 283-84.

Thus courts have found no error when there is no evidence connecting a Plaintiff's noncompliance or lack of treatment to the mental health disorder itself. *See Cole v. Comm'r of Soc. Sec.,* 105 F. Supp. 3d 738, 743-44 (E.D. Mich. 2015) (finding no error where the ALJ relied on the fact that the plaintiff "never sought or received formal mental health treatment" and that no physician had referred the plaintiff to a mental health specialist for treatment); *Coleman v. Comm'r of Soc. Sec.*, 2016 WL 3209660, *9 (S.D. Ohio) (citing *White* and finding no error in an ALJ's consideration of plaintiff's lack of mental health treatment when "there [was] no evidence in the record to explain why plaintiff never sought mental health treatment until he was actively pursuing disability benefits"); *Bass v. Colvin*, 2015 WL 1299266, *22 (N.D. Ohio) (finding no error in consideration of plaintiff's failure to obtain treatment and take medication where plaintiff did not identify evidence that these were a result of his mental condition); *Ross v. Comm'r of Soc. Sec.*, 2013 WL 1284031, *13 (N.D. Ohio) ("Plaintiff did not provide any evidence linking her mental illness to noncompliance[.]").

At step two, the ALJ noted Mr. Halas formed his opinion "after a single interview" and explained:

> I am not persuaded by Mr. Halas's opinion. There is no evidence that the claimant has ever gotten mental health treatment or that any of his treating physicians have even suggested such treatment. To the extent that his activities of daily living are limited, the claimant himself ascribes such limitation to his perceived physical problems, not to any mental health issue. He is, among other things, able to care for his teen-aged son.

(Tr. 14). In his RFC analysis, the ALJ explained:

> The claimant has not had any mental health treatment. He does not take any medication for his psychological symptoms and has never required psychiatric hospitalization or emergency department treatment. The undersigned understands

> that it can be difficult to access regular mental health services, but the claimant's complete lack of treatment in this regard calls into question his reports concerning his mental health limitations. He does not take anti-depressants, despite having access to a primary care physician. He has also not sought mental health treatment via the emergency room or when he has received treatment for his HIV. Indeed, there is no evidence that any of his treating physicians has suggested mental health treatment.

(Tr. 17). He then stated he gave Mr. Halas's opinion "partial weight." *Id.*

The undersigned finds the ALJ's treatment of Mr. Halas's opinion supported by substantial evidence. The undersigned notes at the outset of this analysis that the Court's duty is to review the ALJ's decision for the support of substantial evidence and legal error, not perfection. The ALJ here gave the decision of Mr. Halas "partial weight" because Plaintiff had not had any mental health treatment, did not take medication, and none of his treating physicians had suggested mental health treatment. (Tr. 17)

Plaintiff first argues the ALJ erred in relying on Plaintiff's lack of mental health treatment, citing *White*, *supra.* The undersigned finds no error here. Although it can be error to rely on such a factor, there is no evidence in the record that Plaintiff's failure to seek treatment for mental health issues is a result of his mental impairments. *See, e.g.*, Cole, 105 F. Supp. 3d at 743-44. Moreover, the ALJ did not rely solely on Plaintiff's lack of treatment as a reason for giving Mr. Halas's opinion only "partial weight". He also noted the fact that none of Plaintiff's treating physicians had ever referred him to a mental health specialist. It was reasonable for the ALJ to conclude that if Plaintiff's mental impairments were disabling, his treating physicians may have noted it, or would have suggested he seek mental health treatment. *See Cole,* 105 F. Supp. 3d at 743-44; *Coleman*, 2016 WL 3209660, at *9. There is no such evidence in the

record.[9] Plaintiff also argues Mr. Halas assessed Plaintiff's insight and judgment as "'poor,' thus revealing little capability by [Plaintiff] to fully understand his mental health situation, much less the need to get appropriate care." (Doc. 18, at 3) (citing Tr. 235). However, in this section of Mr. Halas's report, the only given reasons for assessing Plaintiff this way were: "He has HIV and has been incarcerated." (Tr. 235). These reasons do not speak to Plaintiff's ability to seek medical treatment, and the undersigned finds Plaintiff's argument in this regard unpersuasive. Additionally, the record demonstrates Plaintiff was capable of seeking medical treatment for his other problems. Thus, the undersigned finds no error in the ALJ's consideration of Plaintiff's lack of mental health treatment—in conjunction with the fact that no medical professional ever recommended it—as a reason for partially discounting Mr. Halas's opinion.

Plaintiff next argues the ALJ created an internal inconsistency by crediting the opinion of the state agency reviewers (who gave Mr. Halas's opinion "great weight"), but discrediting Mr. Halas's opinion and giving it only "partial weight.". The undersigned finds any such inconsistency not significant in the circumstances. First, the state agency reviewing physicians reviewed the entire record up to the point of their review, not simply Mr. Halas's opinion. *See* Tr. 70-71, 83-88. Second, though they gave "great weight" to Mr. Halas's opinion, the reviewing physicians also answered "no" to the question of whether there were "medical source or other source opinions about [Plaintiff's] limitations or restrictions which are more restrictive than your findings." (Tr. 77, 92). By contrast, the ALJ (and now Plaintiff) read Mr. Halas's opinion as more restrictive than that of the state agency physicians. The terms used by Mr. Halas and by the state agency physicians were different, and neither interpretation—as consistent, or as

---

9. In fact, as the Commissioner points out, during emergency room visits for other problems, notes indicate Plaintiff's mood and affect were normal. *See* Tr. 215 (May 2012), 350 (October 2013), 376 (February 2013). And although Plaintiff reported depression at a gastrointestinal consult, he denied anxiety. (Tr. 386-86) (January 2013).

inconsistent—is unreasonable. This is so because both find various mental restrictions, but use different terminology in their conclusions. However, these different readings are evidence that the state agency reviewing physicians would not necessarily have given Mr. Halas's opinion "great weight" if they had viewed that opinion as inconsistent with—and in fact more restrictive than—their analysis of Plaintiff's ability to work. *See* Tr. 77, 92

The Court does not, nor did the ALJ, as Plaintiff suggests, "ignore the one time examiner and, then, find no doctors discussing mental health issues persuasive as proof of a lack of mental health impairment." (Doc. 18, at 4). Despite Plaintiff's seeming protestations to the contrary, the ALJ here did not reject all mental limitations. Rather, the ALJ gave Mr. Halas's opinion "partial weight" and included multiple mental restrictions in the ultimate RFC analysis.

Moreover, the undersigned finds the ALJ's mental RFC supported by substantial evidence in the record. The ALJ concluded Plaintiff would be:

> limited to simple, routine, low-stress work, which means that he is precluded from working in fast paced production environments, such as on an assembly line or piece rate work. It also means that he is precluded from work done in public and from work that involves interaction with the public. It also means that he is precluded from more than superficial interaction with supervisors and co-workers. Finally, it means that he is precluded from tasks that involve arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety of others.

(Tr. 16). The ALJ emphasized the limitations regarding interactions with others ("And I mean to be strict about both of those limitations."). (Tr. 56). The RFC is consistent with Mr. Halas's observations that Plaintiff would have significant difficulties responding appropriately to supervision and to coworkers in a work setting and difficulties interacting with the public. (Tr. 236); *see also* Tr. 16, 55-56. Additionally, the RFC takes into account—at least to some degree—Mr. Halas's opinion that Plaintiff would have severe problems responding appropriately to work pressures (Tr. 237); *see also* Tr. 16 (limiting to simple, routine, low-stress work).

Mr. Halas opined Plaintiff "appear[ed] to have problems in the area of understanding, remembering, and carrying out instructions", noting Plaintiff having dropped out of school, his estimated "low average" intelligence, and that he does not have a GED[10]. (Tr. 236). He also noted Plaintiff "struggles at times to follow through with simple instructions or directions." The state agency physicians concluded Plaintiff could make simple decisions, and could "perform simple and somewhat complex tasks in a solitary setting without fast paced production standards." (Tr. 76. 92). To the extent these evaluations were inconsistent—and it is not clear they were—it was not unreasonable for the ALJ to rely on the state agency physician's opinion, which put the restrictions in terms relating to Plaintiff's ability to sustain work. The ALJ's decision, therefore, to limit Plaintiff to "simple, routine, low-stress work" was therefore supported by substantial evidence.

Plaintiff also contends the ALJ erred in relying on Plaintiff's self-report of symptoms, when Plaintiff was suffering from mental health symptoms. He argues that "[r]elying on [Plaintiff's] belief about his mental impairments rather than Dr. Halas makes little sense" (Doc. 14, at 14) and "[t]he ALJ is now willing to rely on [Plaintiff's] diluted view of his own psychological state to discredit the only examining mental health source of record" (Doc. 18, at 5). The ALJ stated that Plaintiff himself credited his back pain and gastrointestinal problems as the reasons he could not work. (Tr. 14, 34-35). The undersigned understands Plaintiff's argument, and perhaps had this been the only reason the ALJ gave for giving Mr. Halas's opinion partial weight, it would be error. But it was not the only reason, and, in combination with the record as a whole, the undersigned finds the ALJ's reasoning for giving Mr. Halas's opinion partial weight supported by substantial evidence.

---

10. The undersigned notes this is inconsistent with Plaintiff's testimony that he *did* have a GED. *See* Tr. 31.

Finally, Plaintiff argues that "[d]espite seemingly accepting the state agency psychologists' opinions, the ALJ failed to account for all of the opined limitations", specifically: 1) a moderate limitation in completing a normal workday or workweek, and 2) a moderate difficulty traveling in unfamiliar places. (Doc. 14, at 15). First, just as the ALJ was not required to adopt Mr. Halas's opinion in its entirety, the ALJ was not required to adopt the state agency reviewers' opinions in their entirety in formulating his RFC. *See* 20 C.F.R § 404.1546(c) (responsibility for assessing the RFC rests with the ALJ); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) ("[The ALJ] is not required to recite the medical opinion for a physician verbatim in his residual functional capacity finding."); *Smith v. Colvin*, 2013 WL 6504681, *11 (N.D. Ohio) (ALJ who attributes "great weight" to state-reviewing psychologist opinions not required to include in claimant's RFC all limitations assessed by them); *Smith v. Comm'r of Soc. Sec.*, 2013 WL 1150133 (N.D. Ohio) (noting there is "no legal requirement for an ALJ to explain each limitation or restriction he adopts, or conversely, does not adopt from a non-examining physician's opinion, even when it is given significant weight.") Having reviewed the record as a whole and the ALJ's decision, the undersigned concludes the RFC is supported by substantial evidence. Moreover, the ALJ's decision also at least indirectly accounts for such limitations by limiting Plaintiff to simple low stress work and precluding any work in public or having contact with the public. For the reasons discussed above, the undersigned therefore recommends the Court find the ALJ's mental RFC determination supported by substantial evidence.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned recommends the Commissioner's decision be affirmed.


 s/James R. Knepp II
United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).